**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

|  |  |
|---|---|
| STEPHANIE DIPIERRO, ) | |
| ) | Civ. No. _____ |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | |
| HUGH J. HURWITZ, in his official ) | |
| capacity as Acting Director for ) | |
| the Federal Bureau of Prisons and ) | |
| DR. DEBORAH G. SHULT, in her ) | |
| official capacity as the Assistant Director ) | |
| of the Health Services Division of the ) | |
| Federal Bureau of Prisons. ) | |
| ) | |
| Defendants. ) | |

### DECLARATION OF ALEXANDER YALE WALLEY, MD, MSc

Pursuant to 28 U.S.C. § 1746, I, Alexander Yale Walley, M.D., declare as follows:

1. My name is Dr. Alexander Yale Walley. I am a board certified physician in internal medicine and addiction medicine.

2. I received my medical degree from Johns Hopkins School of Medicine in 2000 and have more than 18 years of experience. I completed my residency at the University of California, San Francisco and my fellowship in clinical addictions research and education at the Boston University School of Medicine, including a Masters of Science in epidemiology at Boston University School of Public Health. A copy of my curriculum vitae is attached as Exhibit 1.

3. Since 2005, I have been an attending physician at the Boston Medical Center. I have also taught at the Boston University School of Medicine since 2007, first as an Assistant

1

Professor and then since 2016 as an Associate Professor.

4. Throughout my career, I have focused on providing primary care and treatment to individuals with substance use disorders. From 2007 to 2014, I was the medical director for the Opioid Treatment Program of the Boston Public Health Commission. Between 2014 and 2016, I was the site medical director of the Opioid Treatment Program of the Health Care Resource Centers in Boston. I have continued as a physician at the Opioid Treatment Program of the Health Care Resource Centers in Boston (23 Bradston Street clinic) since 2016.

5. In my capacity as a physician working in opioid treatment programs, I have treated hundreds of patients with medication for addiction treatment (MAT), primarily with methadone. I also prescribe buprenorphine and naltrexone, the two other FDA-approved medications for opioid use disorder, through my primary care practice at Boston Medical Center. While each of these medications is FDA approved and effective in randomized clinical trials, each medication does not work equally well for every patient. Because opioid use disorder is a highly fatal, but treatable illness, it is crucial that patients and providers are able to choose the medication best for each individual patient.

6. One indication that a patient has been particularly compliant with their treatment program is when they have earned the privilege to take methadone doses at home. By federal and state regulations, to earn take home doses it requires at least 60 continuous days of perfect clinic attendance, counseling attendance, and negative toxicology testing. An additional 60 days at a minimum is required for each additional step in take home privileges (e.g. one to two doses, two to three doses, etc).

7. That being said, I have treated patients who have worked hard to achieve long periods of sustained recovery on medication for opioid use disorder, and it is very common for such

individuals to have multiple short periods of relapse in the midst of long periods of recovery. This is a symptom of the disease of opioid use disorder and is not a sign that the medication is not working. To the contrary, access to the medication empowers patients to limit a relapse to a brief period of time, because re-engagement in treatment is more readily accessible than the routes that require a physical and mentally stressful detoxification taper in an inpatient setting.

8. Similarly, it is common for individuals in long term recovery on MAT to go through periods where they miss some of their doses. Missing occasional doses does not mean that the MAT is not working. This is especially true for my patients who suffer from a dual diagnosis of OUD and some form of mental illness like bipolar disease. The symptoms of mental illness wax and wane, and can pose additional barriers for individuals attempting to make it to the clinic on a daily basis in the early morning. It is similarly challenging for patients who are balancing work responsibilities, parenting responsibilities or other caregiving responsibilities to have perfect daily attendance at methadone programs.

9. Since 2007, I have supervised the provision of methadone to pregnant women incarcerated at South Bay House of Corrections in Suffolk County ("South Bay") who suffer from opioid use disorder. Among other things, this treatment prevents the patients from experiencing withdrawal symptoms that may jeopardize their pregnancy. Furthermore, when released from incarceration, these women are connected and engaged in existing community-based Opioid Treatment Programs, so they can continue their methadone treatment.

10. Typically, South Bay transports the incarcerated patients to the 23 Bradston Street clinic once a week. They are accompanied by a corrections officer and a nurse from South Bay's infirmary. The patients are evaluated by nurses in our clinic, who administer one dose of

methadone on site. The clinic then gives six medical exception take-home doses of methadone in a secure box to the corrections officer, who transports the box to South Bay's infirmary. Either my physician colleagues or I complete an application to the State and Federal regulators for these medical exception take-home doses, which are updated and resubmitted at least quarterly

11. For the next six days, the incarcerated patients go to the South Bay infirmary to self-administer the take-home doses of methadone under the supervision of a nurse. There is a well-established protocol to prevent diversion of the medication. South Bay's infirmary routinely stores many controlled medications, including methadone and opioid-based pain medications, in a secured location within the infirmary. Methadone is a liquid that is administered orally. When it is time for a patient to receive a methadone dose, the nurses require the patients to drink the methadone in front of them, followed by another cup of water, and then finally to speak to them before they are allowed to leave the infirmary. This protocol—which is also employed at the 23 Bradston Street clinic—ensures that the methadone has been ingested and is not diverted.

12. We typically administer methadone to 1 to 4 incarcerated pregnant women at any given time at our clinic. We sometimes see these patients more frequently than once a week, generally when the patient's dosage is being adjusted in the first few weeks of treatment.

13. Administering methadone to incarcerated pregnant women has not disrupted our clinic or caused any administrative difficulties.

14. To the best of my knowledge, the administration of methadone to these patients has never caused any security, safety, or diversion problems at South Bay.

15. Pregnant inmates in Massachusetts also receive methadone at the Massachusetts Correctional

Institute at Framingham ("MCI Framingham"). Staff at MCI Framingham administer methadone directly to pregnant women incarcerated at the facility.

16. To the best of my knowledge, there is no reason why the protocol described for administering methadone to incarcerated pregnant female patients could not also be applied to other incarcerated female patients with the same high degree of safety, security, and efficacy.

17. To the best of my knowledge, the cost of methadone is approximately 1 cent per milligram. As a result, the medication typically costs between 40 and 60 cents per day.

I declare under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on March _12_, 2019.

_____
Dr Alexander Yale Walley